NO. 16-3814

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,
Appellee

v.

WILLIAM J. O'BRIEN III,
Appellant

APPEAL FROM CONVICTION
IN CRIMINAL NO. 15-0021-01 IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIEF FOR APPELLEE UNITED STATES OF AMERICA

LOUIS D. LAPPEN
Acting United States Attorney

ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

M. BETH LEAHY
DAVID E. TROYER
Assistant United States Attorneys

615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8343

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................. 1

    I.    Subject Matter Jurisdiction ........................................... 1

    II.   Appellate Jurisdiction .................................................. 1

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF THE CASE ............................................................... 3

    I.    Procedural History ..................................................... 3

    II.   Statement of Facts ...................................................... 4

        A.    The Pill Conspiracies ......................................... 4

        B.    The Death of Joseph Ennis ................................10

STATEMENT OF RELATED CASES .....................................................16

SUMMARY OF ARGUMENT .............................................................17

ARGUMENT .................................................................................. 20

    I.    O'BRIEN WAIVED HIS CLAIM THAT THE
        DISTRICT COURT VIOLATED HIS RIGHT TO
        COUNSEL BY FAILING TO APPOINT COUNSEL
        TO ADVISE HIM OF THE CONSEQUENCES OF
        PROCEEDING PRO SE, AND DOES NOT
        ESTABLISH PLAIN ERROR IN ANY EVENT ........................... 20

    II.   THE DISTRICT COURT DID NOT ABUSE ITS
        DISCRETION BY LIMITING REDUNDANT
        CROSS-EXAMINATION OF GOVERNMENT
        WITNESSES ............................................................. 34

III.    THE DISTRICT COURT PROPERLY
        INSTRUCTED THE JURY ON THE
        ELEMENTS OF DISTRIBUTION OF A
        CONTROLLED SUBSTANCE RESULTING
        IN DEATH ................................................................................. 49

CONCLUSION ............................................................................................. 56

# TABLE OF AUTHORITIES

## Cases

Alford v. United States,
    282 U.S. 687 (1931) .............................................................................. 34

Burrage v. United States,
    134 S. Ct. 881 (2014) .................................................................... 49, 50

Davis v. Alaska,
    415 U.S. 308 (1974) ............................................................................35

Delaware v. Fensterer,
    474 U.S. 15 (1985) ..............................................................................35

Delaware v. Van Arsdall,
    475 U.S. 673 (1986) .......................................................................34, 35

Faretta v. California,
    422 U.S. 806 (1975) ............................................... 24, 26, 27, 29, 31, 32

Gov't of the Virgin Islands v. Rosa,
    399 F.3d 283 (3d Cir. 2005) ...........................................................22, 23

Iowa v. Tovar,
    541 U.S. 77 (2004) .......................................................................27, 29-31

Johnson v. United States,
    520 U.S. 461 (1997) ............................................................................21

Johnson v. Zerbst,
    304 U.S. 458 (1938) .............................................................. 20, 22, 26

Maine v. Moulton,
    474 U.S. 159 (1985) ........................................................................... 26

Patterson v Illinois,
    487 U.S. 285 (1988) ......................................................................31, 32

United States ex rel. O'Connor v. State of New Jersey,
       405 F.2d 632 (3d Cir. 1969) ................................................... 20

United States v. Atkinson,
       297 U.S. 157 (1936) ............................................................. 21

United States v. Chandler,
       326 F. 3d 210 (2003) ......................................................42, 47

United States v. Ellis,
       156 F.3d 493 (3d Cir. 1998) ................................................ 34

United States v. Frady,
       456 U.S. 152 (1982) ............................................................. 21

United States v. Friedman,
       658 F.3d 342 (3d Cir. 2011) ................................................ 34

United States v. John-Baptiste,
       747 F.3d 186 (3d Cir. 2014) ................................................ 35

United States v. Jones,
       452 F.3d 223 (3d Cir. 2006) ................................................ 27

United States v. Maury,
       695 F.3d 227 (3d Cir. 2012) ................................................ 49

United States v. Mussare,
       405 F.3d 161 (3d Cir. 2005) ................................................ 35

United States v. Olano,
       507 U.S. 725 (1993) ........................................................20, 21

United States v. Peppers,
       302 F.3d 120 (3d Cir. 2002) ..................................... 25-27, 30

United States v. Young,
       470 U.S. 1 (1985) ................................................................ 21

# Statutes

18 U.S.C. § 152 ............................................................................. 3

18 U.S.C. § 371 ............................................................................. 3

18 U.S.C. § 1956 ........................................................................... 3

18 U.S.C. § 3231 ........................................................................... 1

21 U. S. C. § 841 ............................................................. 3, 49, 50

21 U. S. C. § 846 ......................................................................... 3

28 U.S.C. § 1291 .......................................................................... 1

# JURISDICTIONAL STATEMENT

## I. Subject Matter Jurisdiction

Because the defendant was charged in an indictment with violations of federal criminal law, the district court had subject matter jurisdiction over the case pursuant to 18 U.S.C. § 3231.

## II. Appellate Jurisdiction

Based upon the timely filing of a notice of appeal from the order of judgment in a criminal case entered on October 7, 2016, this Court has jurisdiction over this matter under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. (a) Did O'Brien waive his claim that his decision to proceed pro se was not knowing and voluntary because the district court did not appoint counsel to advise him about pro se representation, where O'Brien expressly objected to appointing counsel for this purpose?

(b) If not waived, did the district court commit plain error by failing to appoint counsel to advise O'Brien about his request to proceed pro se, where O'Brien declined to be advised by counsel and the court conducted the mandated colloquy before permitting O'Brien to waive his right to counsel?

2. Did the district court impermissibly limit the defendant's cross-examination of two of the cooperating defendants?

3. Did the district court err in instructing the jury on the charge of dispensing a controlled substance that resulted in death?

## STATEMENT OF THE CASE

## I. Procedural History

On July 14, 2015, a grand jury in the Eastern District of Pennsylvania returned a second superseding indictment charging appellant William J. O'Brien, III, with two counts of conspiracy to dispense and distribute controlled substances outside the course of professional practice and without a legitimate medical purpose, in violation of 21 U.S.C. § 846 (Counts 1 and 2); 114 counts of distribution of Schedule II controlled substances, in violation of 21 U.S.C. § 841(a)(1) (Counts 3 through 116); seven counts of distribution of Schedule IV controlled substances, in violation of 21 U.S.C. § 841(a)(1) (Counts 117 through 123); one count of dispensing controlled substances that resulted in death, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count 124); one count of conspiracy to engage in money laundering, in violation of 18 U.S.C. § 1956 (Count 136); one count of conspiracy to commit bankruptcy fraud, in violation of 18 U.S.C. § 371 (Count 137); and one count of making a false oath in bankruptcy proceedings, in violation of 18 U.S.C. § 152 (Count 139).

On October 8, 2015, during a hearing concerning a conflict of interest of O'Brien's privately retained c0unsel, O'Brien stated that he intended to fire his attorney and requested to proceed pro se. On November 3, 2015, after

conducting the required colloquy regarding the request to proceed pro se, the district court granted O'Brien's request. On November 4, 2015, the court appointed George Newman to serve as standby counsel for O'Brien.

Trial commenced on May 20, 2016. O'Brien represented himself during the nearly six-week-long trial. On June 28, 2016, a jury convicted O'Brien of all counts except for four of the drug distribution counts.

At the sentencing hearing on October 5, 2016, the district court determined that O'Brien's advisory guideline range was life imprisonment. O'Brien also faced a statutory mandatory minimum sentence of 20 years for his conviction for distributing a controlled substance that resulted in death (Count 124). The court granted a downward variance from the advisory range and sentenced O'Brien to 30 years' imprisonment. The court also imposed a five-year period of supervised release, and ordered O'Brien to pay a special assessment of $12,300 and restitution of $342,504, and ordered forfeiture of $5 million in proceeds traceable to the offense.

## II. Statement of Facts

### A. The Pill Conspiracies.

O'Brien was a doctor of osteopathic medicine, licensed to practice in the Commonwealth of Pennsylvania. PSR ¶ 15. As a licensed physician, O'Brien could prescribe controlled substances in accordance with

professional standards for a legitimate medical purpose. The prescription of controlled substances is highly regulated due to the potential for abuse. PSR ¶¶ 10, 14. A prescription for a controlled substance issued outside the usual course of professional practice and without a legitimate medical purpose is a violation of federal law. PSR ¶ 14.

From March 2012 through January 2015, O'Brien used his medical practices as a front for drug trafficking. In exchange for cash, which O'Brien referred to as a "co-pay" to disguise the illegal nature of the payment, pseudo-patients bought prescriptions from O'Brien primarily for oxycodone and methadone, highly addictive Schedule II opioid-based controlled substances, and alprazolam ("Xanax"), a Schedule IV controlled substance. PSR ¶¶ 11-13, 22. These drugs were in demand by street dealers who sold the pills for profit. PSR ¶ 22. From March 2012 through January 2015, O'Brien illegally prescribed an extraordinary number of controlled substances, conservatively estimated at approximately 386,264 oxycodone 30 mg pills; 30,515 oxycodone 15 mg pills; 165,630 oxycodone 10 mg pills; 300,582 methadone 10 mg pills; and 1,520 Xanax pills. PSR ¶ 94.

Co-defendant Angela Rongione facilitated the drug sales by collecting cash, scheduling appointments, and screening new pseudo-patients. PSR ¶ 23. O'Brien sold prescriptions for controlled substances to approximately 40

pseudo-patients per day. PSR ¶ 18. Two of the pseudo-patients to whom O'Brien sold prescriptions were working undercover for the FBI –a cooperating witness ("CW") and a federal agent. PSR ¶ 24. Between January 2014 and December 2014, the CW and agent had multiple appointments with O'Brien. PSR ¶ 24. At each appointment, the CW and agent obtained from O'Brien medically unnecessary prescriptions for oxycodone and Xanax in exchange for cash. PSR ¶ 24. They paid $250 at the first visit, and $200 for each visit thereafter. PSR ¶ 27-28. O'Brien prescribed the controlled substances without any physical examination or diagnosis, and did not follow other standards required for the legitimate prescription of controlled substances. PSR ¶¶ 20, 24. The CW and agent audiotaped and videotaped their encounters with O'Brien. PSR ¶ 25.

The agent, who posed as the CW's niece, accompanied the CW to her appointment on August 7, 2014. The agent had not yet met O'Brien and she did not have a scheduled appointment that day. PSR ¶ 28. At the CW's request, O'Brien agreed to give the agent a "walk in" appointment. PSR ¶ 28. After paying $250 cash and completing a basic intake form, the agent met with O'Brien. O'Brien asked the agent "if you had a big bowl of oxys, how many would you take in a day?" PSR ¶ 25. O'Brien gave the agent a prescription for 120 oxycodone 30 mg pills and 60 Xanax .5 mg pills. PSR ¶

28. During a visit on October 2, 2014, O'Brien offered the agent a prescription for Xanax in exchange for oral sex. The agent declined. PSR ¶ 26.

O'Brien also gave prescriptions to drug-addicted "dancers" at strip clubs in exchange for sex. PSR ¶¶ 32, 95. Kathleen Reeves learned about O'Brien from a patron of the strip club where she worked. Reeves, who became addicted to opioid pills, performed oral sex on O'Brien in exchange for oxycodone prescriptions. PSR ¶ 33-34. Although she offered to pay the $200 cash fee, O'Brien would only fill Reeves' prescriptions in exchange for sex. PSR ¶ 35. Deanna Lane, a heroin and opioid pill addict, who worked as a "dancer" to support her drug habit, testified that she crushed the oxycodone pills O'Brien prescribed and injected the substance into a vein in her arm. PSR ¶ 96. As with Reeves, O'Brien required Lane to perform oral sex for opioid prescriptions, even when Lane was sixth months pregnant. PSR ¶ 98-99. Lane's child was born prematurely and addicted to opioids. PSR ¶ 99.

O'Brien prescribed controlled substances to hundreds of pseudo-patients in exchange for cash, sex, and other favors. As receptionist and co-defendant Angela Rongione testified, O'Brien was "the candy doctor, the pill doctor." Supp. App. 791. Rongione described O'Brien as "a drug dealer" who "prescribed narcotics to every single patient." Supp. App. 768.

In the other charged conspiracy, O'Brien supplied prescriptions for controlled substances to members of the outlaw Pagans Motorcycle Club.[1] PSR ¶ 19. Pagan members and their associates recruited pseudo-patients (mostly, friends, girlfriends, and family members) to buy prescriptions from O'Brien, primarily for oxycodone 30 mg pills, in exchange for approximately $200 in cash. PSR ¶ 38. After filling the prescriptions at a pharmacy, the recruited pseudo-patient would give the pills to the Pagans or their designees. PSR ¶ 39. The Pagans sold the pills wholesale to street dealers. PSR ¶ 39.

As the conspiracy matured, the Pagans and their associates purchased prescriptions from O'Brien without pseudo-patients coming to O'Brien's office. PSR ¶¶ ¶ 45, 49, 60. The Pagans' associates gave O'Brien a list of names for whom they wanted oxycodone prescriptions, and O'Brien wrote prescriptions for the drugs, as requested, in exchange for $200 per "patient." PSR ¶¶ ¶ 45, 49, 60.

The purported medical charts for the Pagans members were devoid of legitimate documentation. For example, the chart for Patrick Treacy, a 50-

---

[1] Michael Thompson, Peter Marrandino, Joseph Mehl, Joseph Mitchell, Sr., Patrick Treacy, Charles Johnson, Frank Corazo, Jr., and Jennilynn Chambers were charged in the Count Two conspiracy. Co-conspirators Leonard Weinckowski (Cr. No. 15-0325) and Bernadino Varallo (Cr. No. 15-0326) were charged separately.

year-old enforcer for the Pagans who routinely obtained prescriptions for large quantities of oxycodone and methadone from O'Brien, PSR ¶ 85, stated that Treacy reported on his intake form that he had been pregnant, was menstruating, and that he recently had a PAP test. PSR ¶ 79.[2]

Dr. Stephen Thomas, an expert in anesthesiology and pain management medicine, PSR ¶ 104, reviewed O'Brien's patient charts. Dr. Thomas opined that "the cavalier nature" with which O'Brien prescribed the various drugs was "exceedingly scary." Supp. App. 945. Thomas did not find one legitimate oxycodone 30 mg prescription written by O'Brien. Supp. App. 942. On cross-examination, when O'Brien sarcastically asked Thomas whether he had done anything right, Thomas replied, "[t]hat's a hard one." Supp. App. 1146. Thomas explained that O'Brien was "prescribing illegally outside the course of the usual professional practice, not in accordance with the accepted treatment principles of any responsible segment of the medical

---

[2] O'Brien also asked Treacy to perform acts of violence on his behalf. PSR ¶ 80. For example, in a conversation recorded by a former patient in O'Brien's office, O'Brien threatened to "hunt you down like a dog and hurt you" if the patient did not pay O'Brien $2,000 the next day. PSR ¶ 81. When the patient did not pay, O'Brien sent Treacy and Joseph Mehl to collect the money. PSR ¶ 82. Treacy and Mehl went to the patient's residence carrying weapons. PSR ¶ 83. Mehl gave the patient O'Brien's business card and demanded payment. PSR ¶ 83. The pair left when a neighbor called the police. *Id.*

community and frequently violating the bounds of a doctor-patient relationship." Supp. App. 1227-28.

### B.    The Death of Joseph Ennis.

On December 22, 2013, 38-year-old Joseph Ennis was found dead in his apartment. PSR ¶ 103. Police recovered pill bottles containing oxycodone, methadone, and cyclobenzaprine, a muscle relaxer, all prescribed by O'Brien. PSR ¶ 103. The coroner ruled that Ennis died from an adverse effect of those drugs. PSR ¶ 103.

In January 2011, Ennis had sustained a back injury when he was hit by a van while walking along the street. PSR ¶ 100. Ennis's personal injury attorney referred Ennis to O'Brien for evaluation and treatment. PSR ¶ 100. At that time, O'Brien owned and operated a group of family medical practices under the name WJO, Inc. ("WJO"). PSR ¶ 15. From January 26, 2011, through October 7, 2011, Ennis was treated at WJO by Dr. Pickard. Supp. App. 1400-01. Dr. Pickard prescribed physical therapy and chiropractic care to treat Ennis's back injury, and prescribed a limited number of oxycodone 10 mg pills for pain. Supp. App. 992-94, 1400-01. When O'Brien took over Ennis's care on October 18, 2011, he dramatically increased the number of

oxycodone 10 mg pills from 30 to 100, without explanation. Supp. App. 994, 1402.[3]

In July 2012, after O'Brien was terminated from WJO, he opened a solo practice called "Dr. Bill O'Brien, LLC." PSR ¶ 16-17. Ennis continued to see O'Brien at his new practice. Supp. App. 1403. At Ennis's first visit, at which he paid the customary $200 in cash, O'Brien increased his prescription to 150 oxycodone 15 mg pills. Supp. App. 1403. Ennis continued to obtain prescriptions from O'Brien for 150 oxycodone 15 mg pills on a monthly basis until January 2013, when O'Brien doubled the pill dosage to 30 mg. Supp. App. 1403. From January 2013 through September 2013, Ennis obtained prescriptions from O'Brien for 120 oxycodone 30 mg pills on a monthly basis.

In April 2013, O'Brien added methadone to the drug regimen, and prescribed both 120 oxycodone 30 mg pills, and 120 methadone 10 mg pills. Supp. App. 996, 1403. Methadone is three times as potent as morphine. Supp. App. 944. There was no legitimate medical reason to prescribe methadone in combination with oxycodone. Supp. App. 947. While on this

---

[3] A summary of treatment notes from the WJO and O'Brien LLC charts was admitted into evidence, without objection (S*ee* Supp. App. 1405), as Government Exhibit 1808. See Supp. App. 1400-04. Dr. Thomas's testimony was in part based on this summary exhibit.

combination of drugs, Ennis was involved in two single-vehicle accidents, first driving into a pole, and then driving off the road into the woods, which indicated that Ennis was suffering from brain toxicity from high levels of oxycodone and methadone prescribed by O'Brien. Supp. App. 985-86.

In June 2013, O'Brien added another prescription for a six-month supply of the muscle relaxer Flexeril, a brand name for cyclobenzaprine. Supp. App. 1403. In August 2013, O'Brien discontinued methadone, and prescribed 120 oxycodone 10 mg (Percocet) pills in addition to 120 oxycodone 30 mg pills. Supp. App. 996. In September 2013, O'Brien again increased the dosage to 90 oxycodone 15 mg pills, in addition to 120 oxycodone 30 mg pills. Supp. App. 996-98, 1403.

In October and November 2013, Ennis saw O'Brien biweekly, and obtained oxycodone 30 mg prescriptions at each visit. Supp. App. 1403. In October 2013 and November 2013, O'Brien prescribed Ennis 270 oxycodone 30 mg pills, and 180 oxycodone 30 mg pills, respectively. Supp. App. 1403-04. On December 17, 2013, the last appointment before Ennis's death, O'Brien inexplicably reintroduced methadone, prescribing both 120 oxycodone 30 mg pills and 60 methadone 10 mg pills. Supp. App. 986, 997-98. Five days later, Ennis was discovered dead in his apartment.

The evidence showed that O'Brien's prescriptions to Ennis were outside the course of professional practice and not for a legitimate medical purpose. Supp. App. 988. Ennis's medical chart contained no justification for the prescriptions, and showed an "absence of the minimum standards for record keeping." Supp. App. 935-36, 938. At least once, O'Brien refused to refill Ennis's prescription for 120 oxycodone 30 mg pills, but only because Ennis did not have the full $200 cash fee. However, O'Brien was willing to bargain, telling his staff, "if he only pays half, he only gets half," meaning that O'Brien was willing to write a prescription for half the number of pills in exchange for half the usual cash fee. Supp. App. 438.

Dr. Thomas concluded that the combination of methadone and oxycodone killed Ennis. Thomas stated, "we see the mechanism very clearly for Mr. Ennis's death caused by the combined effects of methadone, prescribed by Dr. O'Brien, and oxycodone, prescribed by Dr. O'Brien." Supp. App. 991. Thomas reasserted several times on cross-examination, "without methadone and oxycodone, Mr. Ennis would be alive," Supp. App. 1283; "had he not had the methadone and oxycodone, he would be alive," Supp. App. 1284; and "the cyclobenzaprine itself would not produce his death," Supp. App. 1288.

On redirect examination, Dr. Thomas confirmed his opinion, discounting the effect of the cyclobenzaprine:

> Q:  . . . in your professional opinion, was it still the drugs methadone and oxycodone that killed him?
>
> A: Yes.
>
> Q: And despite the presence of the cyclobenzaprine, is it still your professional opinion, then, but for the methadone and oxycodone ingested by Joseph Ennis prescribed by the defendant, Joseph Ennis would not have died?
>
> A: That is correct.

Supp. App. 1291. Thomas concluded his testimony by stating that "absent the oxycodone and methadone, he would not have died." Supp. App. 1294.

Dr. Ian Hood, the medical examiner who conducted the autopsy, concluded that Ennis died from "an adverse effect of drugs." Supp. App. 1346. Hood found that Ennis died from a combination of oxycodone, methadone, and cyclobenzaprine. Supp. App. 1355. Although the experts had slightly different views of the involvement of cyclobenzaprine – Dr. Thomas testifying that the drug was not contributory; and Dr. Hood finding that cyclobenzaprine had some effect on Ennis – they agreed that cyclobenzaprine alone did not cause Ennis's death. Supp. App. 1379. When asked by O'Brien, "And it is still your professional opinion that the

cyclobenzaprine alone did not kill Joseph Ennis?" Hood responded "correct."

Supp. App. 1379.

## STATEMENT OF RELATED CASES

Fourteen defendants were convicted in connection with this scheme. Except for O'Brien, all defendants pleaded guilty. The following defendants are awaiting sentencing:  Joseph Mehl (15-00021-5); Michael Thompson (15-00021-3); Elizabeth Hibbs (15-00021-11); Bernadino Varallo (15-00326-1); and Leonard Weinkowski (15-00325-1).

Patrick Treacy filed an appeal at No. 17-1636, which is pending before this Court.

The government is not aware of any other related case or proceeding that is completed, pending, or about to be presented before this Court or any other court or agency, state or federal.

## SUMMARY OF ARGUMENT

1. O'Brien has waived his claim that the failure to appoint counsel to represent him prior to the hearing on his request to proceed pro se violated his Sixth Amendment right to counsel. Although the government requested the district court to appoint counsel to represent O'Brien before proceeding with a hearing on this issue, O'Brien opposed the government's request and steadfastly asserted his right to proceed pro se. Accordingly, O'Brien has waived his right to pursue this claim on appeal.

Even if this issue was not waived, the district court did not commit plain error by failing to appoint counsel for this purpose. First, there is no precedent holding that a court is required to appoint counsel to advise a defendant who has moved to proceed pro se about the consequences of that decision, and that the failure to do so constitutes a violation of a defendant's Sixth Amendment right to counsel. This claim fails on this basis alone. Moreover, other than claiming that he would likely not have decided to proceed pro se if he had consulted with counsel, O'Brien fails to identify any additional information or advice that counsel would have provided that would have altered his decision. Indeed, the thorough *Peppers* colloquy conducted by the court fully apprised the defendant of his rights and the consequences of pro se representation, including the serious risks posed by

proceeding pro se, and O'Brien stated that he fully understood the consequences.

2. The district court did not improperly limit cross-examination of two cooperating defendants regarding their expectations of sentencing leniency as a result of their cooperation. The court did not limit questioning of Marrandino at all, but intervened to briefly explain the Section 5K1.1 process. Marrandino had already answered questions about his understanding of the cooperation agreement and his sentencing expectations, and O'Brien chose not to pursue this matter further. The court also did not improperly limit the cross-examination of Rongione. O'Brien questioned Rongione about her expectations for leniency on three separate occasions, and only in the last exchange did the court preclude questions that had already been asked and answered during her examination. In addition, the court allowed O'Brien to conduct lengthy and wide-ranging cross-examinations of these witnesses that fully explored their backgrounds, veracity, and potential biases.

3. The district court properly charged the jury on the count charging O'Brien with distribution of controlled substances resulting in death. The instruction was consistent with the commentary to the Third Circuit model instructions, and did not err by refusing to modify the instruction to state

that the government must prove that controlled substances dispensed by the defendant that resulted in death were taken "in accordance with instructions by the prescribing physician." There is no legal support for such an instruction; indeed such a requirement is nonsensical in a case involving the illegal dispensing of drugs without a legitimate medical purpose, as O'Brien did here. O'Brien's other objections to the instruction are equally unfounded and certainly did not mislead or confuse the jury or unfairly prejudice O'Brien.

# ARGUMENT

## I. O'BRIEN WAIVED HIS CLAIM THAT THE DISTRICT COURT VIOLATED HIS RIGHT TO COUNSEL BY FAILING TO APPOINT COUNSEL TO ADVISE HIM OF THE CONSEQUENCES OF PROCEEDING PRO SE, AND DOES NOT ESTABLISH PLAIN ERROR IN ANY EVENT

### Standard of Review

As explained below, although the government requested the district court to appoint counsel to represent O'Brien in connection with his request to proceed pro se, O'Brien opposed the request to appoint counsel for this purpose and steadfastly asserted his right to proceed pro se. Accordingly, O'Brien has waived his claim that the failure to appoint counsel for this limited purpose violated his Sixth Amendment right to counsel. If the issue is not waived, review is for plain error.

A waiver of an issue requires "an intentional relinquishment or abandonment of a known right or privilege." *United States ex rel. O'Connor v. State of New Jersey*, 405 F.2d 632, 634 n.2 (3d Cir. 1969), quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). *See United States v. Olano*, 507 U.S. 725, 733 (1993).

Absent waiver, it is the defendant's burden to establish plain error. *United States v. Olano*, 507 U.S. 725, 734-35 (1993). To do so, he must prove that (1) the court erred; (2) the error was obvious under the law at the

time of review; and (3) the error affected substantial rights, that is, the error affected the outcome of the proceedings. *Johnson v. United States*, 520 U.S. 461, 467 (1997). If all three elements are established, the Court may, but need not, exercise its discretion to award relief. *Id.* That discretion should be exercised only in cases where the defendant is "actually innocent" or the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  *Olano*, 507 U.S. at 736, quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936). The "plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" *United States v. Young*, 470 U.S. 1, 15 (1985), quoting *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982).

## Discussion

Defendant/appellant William J. O'Brien, III, contends that the district court erred by failing to appoint counsel to represent him at the hearing on his request to proceed pro se. Br. 9. He contends that, without the assistance of counsel, his waiver was not knowing or voluntary, and he was thus deprived of his Sixth Amendment right to counsel.

As an initial matter, O'Brien has waived his right to assert this claim on appeal. A party waives the right to raise an issue on appeal when it intentionally relinquishes or abandons a known right. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Gov't of the Virgin Islands v. Rosa*, 399 F.3d 283, 291 (3d Cir. 2005). Thus, "[t]he threshold question is whether the defendant was aware of the relinquished or abandoned right." *Rosa*, 399 F.3d at 291 (internal citations omitted). "If he had that knowledge, yet intentionally chose to abandon the right, the failure to object will be deemed a 'waiver' depriving him of an opportunity to obtain relief on appeal." *Id.* O'Brien waived his right to have counsel appointed to advise him about pro se representation, as he opposed the government's request to appoint counsel for this purpose, as well as the court's offer to allow him to consult with counsel before making a final decision on the pro se request.

After O'Brien was arrested in January 2015, he retained Carlos Martir, Esq. On May 1, 2015, the government filed a motion regarding a potential conflict of interest on Martir's part due to a past relationship between a member of Martir's immediate family and a government witness. On May 27, 2015, O'Brien hired attorney Gregory J. Pagano and fired Martir.

On July 27, 2015, the government filed a motion seeking to disqualify Pagano as O'Brien's attorney due to conflicts of interest. DDE # 141. As set forth in the motion, the second superseding indictment returned on July 16, 2015, added a second drug distribution conspiracy count, and alleged that Frank Corazo, Jr., was a member of that conspiracy. A conflict arose because Pagano was representing Corazo in a related state drug case, while Corazo was cooperating against O'Brien in this case. Pagano also had previously represented codefendant Joseph Mitchell, also named in the second superseding indictment, on unrelated state charges.

At a hearing on this motion on October 8, 2015, O'Brien announced that he intended to fire Pagano and that he was "going to go pro se." Supp. App. 4. The court strongly advised against him doing so. *Id.* O'Brien responded that he "would like to exercise my Sixth Amendment rights." *Id.* The court then heard argument on the removal motion. Later that same day, the court granted the motion to remove Pagano as counsel. DDE # 190.

Before court adjourned, O'Brien reiterated his desire to represent himself:

> I have appeared pro se in state court, in divorce court, in bankruptcy court and one of the other courts, Workman's Compensation Court. So I did proceed pro se multiple times. . . . I have a right to proceed pro se and whenever the court would like to have that hearing or I guess whatever you would like to have.

Supp. App. 20.

The court continued the hearing on the motion to proceed pro se. Prior to the hearing, the government filed a motion asking the district court to appoint counsel for the purpose of advising O'Brien on his request to proceed pro se. DDE # 192. The government posited that this was warranted because O'Brien's prior counsel had been removed for conflicts of interest. O'Brien filed a response to the government motion in which he opposed the government's request to appoint counsel and asserted that he had the right to proceed pro se. DDE # 208; Supp. App. 1387-90. O'Brien noted that the Supreme Court's decision in *Faretta v. California*, 422 U.S. 806 (1975), recognized that he had the right to proceed to pro se, "even if works ultimately to his own detriment." O'Brien further noted that *Faretta* held that a defendant who wishes to proceed pro se must do no more than state his request unambiguously. O'Brien stated that he exercised his Sixth Amendment right to represent himself at the October 8 hearing, and that he had "no issue with a colloquy being scheduled," but also sought to have a bail hearing at the same time. Supp. App. 1390.

The district court conducted a hearing on the request to proceed pro se on November 3, 2015. Supp. App. 27. At the outset of the hearing, the government again asked the court to appoint counsel before conducting its

colloquy, observing that O'Brien had not had not been represented by conflict-free counsel. Supp. App. 27-35. The district court rejected the government's request, stating it "appreciated the government's advice" but it would proceed with the colloquy. Supp. App. 35. The court then proceeded to conduct the colloquy in accordance with *United States v. Peppers*, 302 F.3d 120 (3d Cir. 2002).

After this colloquy, the court inquired whether O'Brien wanted "to discuss this decision with counsel" before making a final decision. Supp. App. 47-48. Without hesitation, O'Brien replied:

> No . . . I would like to go pro se. I've been saying I want to go pro se. I answered all the questions, Your Honor. I understand *Peppers* had to be done, I understand you had to ask the colloquy and I would like to go forward.

Supp. App. 47-48.

The court determined that O'Brien's decision to proceed pro se was made affirmatively and unequivocally, and that he had knowingly and voluntarily waived his right to counsel. Supp. App. 48. The court specifically found that O'Brien understood "the scope of the right, sacrifice and the restrictions and challenges he will face." *Id.* The court granted O'Brien's request to represent himself. *Id.* The next day, the court appointed attorney George Newman as standby counsel.

On appeal, O'Brien ignores the fact that he opposed the government's request to appoint counsel to represent him for this purpose, and that he steadfastly asserted that he wanted to proceed pro se. O'Brien also fails to acknowledge that after the *Peppers* colloquy, the court offered to let him consult with counsel before making a final decision. Because O'Brien affirmatively declined to be represented by counsel for this purpose, he has waived his right to pursue this claim on appeal. Accordingly, this Court should not consider this argument.

Nevertheless, even if reviewed for plain error, O'Brien's position is meritless. The Sixth Amendment provides a defendant in a criminal case with the right to counsel at all critical stages of the criminal process. *Maine v. Moulton*, 474 U.S. 159, 170 (1985). The right to counsel in a criminal prosecution embodied in the Sixth Amendment carries with it the corollary right to proceed pro se. *Faretta v. California*, 422 U.S. 806, 819-21 (1975). A defendant may waive representation, but the "waiver of the right to counsel must be knowing, voluntary, and intelligent." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). A defendant who waives his right to counsel in favor of self-representation "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with his eyes open.'"

*Faretta*, 422 U.S. at 835. The defendant must knowingly, intelligently, and voluntarily forego the benefits of representation by counsel. *Id.*

To assure that a decision to proceed pro se is knowing and voluntary, the trial court must conduct a thorough inquiry of the defendant. The constitutional requirement for a Sixth Amendment waiver of counsel is satisfied "when the trial court informs the accused of the nature of the charges against him, of his right to be counseled regarding his plea, and of the range of allowable punishments attendant upon the entry of a guilty plea." *Iowa v. Tovar*, 541 U.S. 77 (2004). This Court has identified 14 questions that provide "a useful framework for the court to assure itself that a defendant's decision to proceed pro se is knowing and voluntary." *Peppers*, 302 F.3d at 136-37; *see also United States v. Jones*, 452 F.3d 223, 228-29 (3d Cir. 2006) ("The purpose of the inquiry is to establish that the defendant: (1) has 'clearly and unequivocally' asserted his desire to represent himself; (2) understands the nature of the charges, the range of possible punishments, potential defenses, technical problems that [he] may encounter, and any other facts important to a general understanding of the risks involved; and (3) is competent to stand trial.") (citations omitted).

In this case, the district court assiduously followed the colloquy required by *Peppers*. The district court queried the defendant about each of

the elements identified in *Peppers* regarding the consequences of self-representation. Supp. App. 35-47. Indeed, O'Brien agrees that the colloquy complied with *Peppers*, and does not contend that it was in any way inadequate. Br. 15. Because he cannot find fault with the court's colloquy and its acceptance of his waiver on the basis of the colloquy, he instead contends that his waiver was invalid because the court did not follow the government's recommendation and appoint counsel to advise him in connection with his request to proceed pro se.

O'Brien cites no authority that supports the proposition that a defendant must be represented by counsel in order to waive the right to counsel, and there is none. Indeed, O'Brien relies entirely on the government's statement in support of its recommendation that the court appoint counsel for this purpose. And while the government strongly urged the court to appoint counsel, this was not constitutionally required but was what the government perceived to be the better course of action under the circumstances of this case. Indeed, the government merely anticipated that appointing counsel for this purpose would eliminate any argument that O'Brien's waiver of counsel was not knowing and voluntary, which is precisely the issue now presented in this appeal.

On reflection, we believe that the district court was correct in declining the government's entreaty that it appoint counsel, once the defendant steadfastly objected to that course. In *Faretta,* in recognizing the right to self-representation, the Supreme Court relied on "a nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Faretta v. California*, 422 U.S. at 817. The Court concluded: "To thrust counsel upon the accused, against his considered wish, thus violates the logic of the [Sixth] Amendment." *Id.* at 820. Thus, there is no decision, to our knowledge, requiring the appointment of counsel in connection with a *Faretta* proceeding. At the very least, this absence of authority requires denial of the claim on plain error review.

The Supreme Court's decision in *Tovar* does not counsel otherwise. In *Tovar*, the defendant maintained that his waiver of counsel was invalid because he "was never made aware by the court . . . of the dangers and disadvantages of self-representation." 541 U.S. at 85 (citation and internal quotation marks omitted). The case thus concerned "the extent to which a trial judge, before accepting a guilty plea from an uncounseled defendant, must elaborate on the right to representation." *Id.* at 81. The Court held that

"the constitutional requirement is satisfied when the trial court informs the accused of the nature of the charges against him, of his right to be counseled regarding his plea, and of the range of allowable punishments attendant upon the entry of a guilty plea." *Id.* at 81. In answering this question, the Court did not delineate or describe how a trial court should "inform[ ] the accused . . . of his right to be counseled regarding his plea." *Id.* Rather, the Court asked the broader question of whether Tovar's waiver of counsel was knowing, voluntary, and intelligent, stating:

> We have described a waiver of counsel as intelligent when the defendant "knows what he is doing and his choice is made with eyes open." We have not, however, prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel. The information a defendant must possess in order to make an intelligent election, our decisions indicate, will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding.

Id. at 88 (citations omitted).

*Tovar* does not suggest that a defendant must be represented by counsel in order to knowingly and intelligently waive the right to counsel, but only that the defendant must be adequately advised of his right to counsel and the repercussions of proceeding pro se. While *Tovar* declined to delineate how this should be accomplished, this Court in *Peppers* did precisely that, and the district court here conducted the required inquiry. No

more was constitutionally required. Since there was no requirement that the
district court appoint counsel before accepting the defendant's waiver of
counsel, the district court did not err, never mind commit plain error, by not
doing so.

Nor has O'Brien shown that he was prejudiced by the failure to appoint
counsel for this purpose. Although O'Brien asserts that "it is reasonably
likely" that he would have not elected to proceed pro se "had conflict free
counsel been appointed to represent [him] prior to the *Faretta-Peppers*
hearing," Br. 15, O'Brien does not identify any additional information that an
attorney would have provided that would have altered his decision to
proceed pro se. When considering a right-to-counsel waiver, the court should
determine "what purposes a lawyer can serve at the particular stage of the
proceedings in question, and what assistance [counsel] could provide to an
accused at that stage." *Tovar*, 541 U.S. 77, 90 (2004), citing *Patterson v
Illinois*, 487 U.S. 285, 298 (1988). The thorough *Peppers* colloquy covers the
pertinent issues regarding self-representation. Having an attorney review
these same factors and advise O'Brien of the perils of self-representation
would clearly not have swayed his decision to proceed pro se. The thorough
colloquy conducted by the district court here surely covered the very issues
that counsel would have raised with O'Brien, and in particular, the

disadvantages of proceeding pro se. In light of this, appointing counsel to represent O'Brien in connection with this hearing would have been a futile exercise that would not have altered his decision to proceed pro se.[4]

O'Brien's true complaint regarding his decision to proceed pro se is not that it was not knowing and intelligent, but that he now believes that representing himself at trial worked to his detriment. Br. 15. O'Brien complains that he was "woefully inadequate in representing himself," and it is "evident from the trial record" that experienced counsel would likely have achieved a more favorable result on at least some of the counts. *Id.* O'Brien's post-mortem analysis of his performance at trial is simply not relevant to his claim that the failure to appoint counsel to advise him about pro se representation violated his constitutional right to counsel. Indeed, the district court fully advised O'Brien of the risks of pro se representation, and strongly advised him against self-representation, citing exactly the pitfalls O'Brien now regrets.

---

[4] Indeed, O'Brien was fully aware of the consequences of self-representation even prior to the November 2015 hearing, as exhibited by his response to the government's request for appointment of counsel, in which he cited *Faretta* at length, including the statement that "a defendant who chooses to represent himself must be allowed to make that choice, even if it works ultimately to his own detriment." Supp. App. 1387–88.

Finally, O'Brien had ample opportunity to change his mind prior to trial, which began nearly six months later. During this period and at the trial itself, O'Brien never expressed any doubts or concerns about representing himself, during a time he had standby counsel available. As the record clearly demonstrates, O'Brien knew exactly what he was doing when he decided to proceed pro se. Thus, even if O'Brien did not waive his right to raise this claim on appeal, it is entirely meritless, and he is not entitled to any relief on this basis.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY LIMITING REDUNDANT CROSS-EXAMINATION OF GOVERNMENT WITNESSES

### Standard of Review

A district court's limitation on cross-examination of witnesses is reviewed for abuse of discretion, *see United States v. Ellis,* 156 F.3d 493, 498 (3d Cir. 1998), and will be reversed only where the limitation "is so severe as to constitute a denial of the defendant's right to confront witnesses against him and it is prejudicial to the substantial rights of the defendant," *United States v. Friedman*, 658 F.3d 342, 352 (3d Cir. 2011).

### Discussion

O'Brien claims the district court prohibited him from cross-examining cooperating co-defendants Peter Marrandino and Angela Rongione about the "magnitude" of the sentence reduction they believed they would receive as a result of their cooperation. Br. 16-20. This claim is meritless.

It is well established that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Regulation of the scope and extent of cross examination is committed to the sound discretion of the trial court. *Alford v. United States*, 282 U.S. 687

(1931). A trial court has wide latitude to impose reasonable limits on cross-examination," including to prevent "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *United States v. John-Baptiste*, 747 F.3d 186, 211 (3d Cir. 2014, quoting *United States v. Mussare*, 405 F.3d 161, 169 (3d Cir. 2005). The Confrontation Clause guarantees the "*opportunity* for effective cross examination, not cross examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original). With respect to Confrontation Clause claims, the reviewing court must evaluate "the potential effect of the foreclosed cross-examination on the jury's evaluation of a particular witness." *Id.* To make out a violation of the Confrontation Clause, a criminal defendant must show "that he was prohibited from engaging in otherwise appropriate cross-examination." *Id.*

Cross-examination of a cooperating witness who testifies pursuant to a plea agreement with the government "is the principal means by which the believability of [the] witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). It is impermissible to preclude all inquiry of a cooperating coconspirator's expectations for leniency, as that presents "a motive for favoring the prosecution in his testimony." *Van*

*Arsdall*, 475 U.S. at 680. Thus, a defendant "states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Id.*

Here, the district court provided O'Brien with substantial leeway on cross-examination. At the outset of trial, the court advised O'Brien that he could inquire beyond the scope of direct examination. Supp. App. 1394.[5] O'Brien was given this same wide latitude with the cooperating defendants, and was fully permitted to question the witnesses about their plea agreements with the government. Co-defendant Peter Marrandino testified

---

[5] Many of O'Brien's questions were irrelevant, repetitive, and abusive. O'Brien repeatedly asked witnesses to render medical opinions, and to speculate on the thought processes of others. He also repeatedly attempted to elicit inadmissible hearsay, and improperly offered facts that no witness would know, by prefacing the question with, "Would it surprise you to know . . . ?" Supp. App. 1392. O'Brien repeatedly asked questions designed to embarrass and harass witnesses. Supp. App. 1391-99. O'Brien's cross-examinations were typically two to four times longer than the direct examinations. Supp. App. 1392. By the ninth day of trial, O'Brien's conduct had become so disruptive and dilatory that the government filed a memorandum of law advocating for restrictions on the defendant's cross-examination. Supp. App. 1391-99. The government noted that O'Brien was permitted to:  (1) cross-examine a former employee, who testified mainly as a custodian of records, about an alleged extramarital relationship, after first confirming that her husband was in the courtroom; (2) ask an FBI agent if she was a "jock" in high school; (3) question an informant about her son's heroin habit; and (4) ask an undercover FBI agent who, at the time she testified was visibly pregnant, if a neighborhood drug dealer had fathered her unborn child. Supp. App. 1393-94.

on direct examination about his plea agreement with the government. He stated that he had agreed to cooperate fully and truthfully with the government, including testifying truthfully at trial. Supp. App. 100-01. He stated that he hoped to get a lower sentence in exchange for his cooperation but no one had promised that he would receive a reduced sentence. Supp. App. 102. He also stated that the government had not promised to file a motion on his behalf, and ultimately the judge would make the final decision. *Id.*

On cross-examination, which continued for almost two days, O'Brien twice questioned Marrandino about his expectation for leniency. O'Brien asked Marrandino if he was "under the assumption that if you testify and plead out and tell the truth, your sentence will be lighter than if you had fought them?" to which Marrandino answered, "I am hoping so if that turns [sic] out to be the situation, then I am grateful." Supp. App. 251-52.

The next day, O'Brien again questioned Marrandino about the terms of his plea agreement with the government:

> O'Brien: Okay. Now, that plea agreement you signed, a lot of the agreement is things that you need to do, that you need to cooperate, that you need to say things, you can't omit anything, a lot of that is about you. But the government said there is something called a "5K" they can file?
>
> Marrandino: I don't know.

O'Brien: Is that the document they file after this is all over before sentencing and says to the judge they would like to lower your time, is that what you are cooperating for is a 5K?

Marrandino: I believe so.

O'Brien: And that 5K is up to the discretion of the government?

Marrandino: I don't know who it was up to. I honestly thought it was up to your honor. I don't know who it is up to.

Supp. App. 345-46.

Following this exchange, O'Brien displayed Marrandino's plea agreement with the government and asked to enlarge the paragraph "about the 5K" for the jury. At that point the court stepped in, explaining that the government had the discretion to decide whether to file a 5K1.1 motion, but the court would decide whether or not it will accept the government's "reasons." Supp. App. 347. The court added that sentencing was the court's issue and "that is as much as we are going to go into the 5K1.1 motion." *Id.* O'Brien lodged no objection to the court's explanation, nor did he ask Marrandino any further questions about the plea agreement or Marrandino's sentencing expectations.

The record demonstrates that the court did not curtail O'Brien's questioning about the cooperation plea agreement or Marrandino's sentencing expectations. O'Brien fails to acknowledge Marrandino's testimony on direct examination or his first exchange with Marrandino about

his potential sentence, and instead asserts that the district court's brief explanation of the 5K process effectively precluded further questioning about Marrandino's sentencing expectations. Br. 17. His interpretation is unconvincing, as the court's comments merely clarified the 5K1.1 process itself but did not preclude additional questioning about Marrandino's potential sentence. Moreover, this claim completely overlooks the fact that O'Brien had already asked Marrandino questions about this issue, and Marrandino had answered those questions.

The record also shows that the court fully permitted O'Brien to question Rongione about her expectations for leniency. Rongione testified on direct examination that she understood that she faced a maximum sentence of 20 years' imprisonment, and a sentence of 51 to 63 months under the Sentencing Guidelines. Supp. App. 372. Rongione acknowledged that she had agreed to cooperate with the government by providing truthful information and testimony, and that the government might but was not required to file a motion seeking a reduced sentence on her behalf. Supp. App. 373. She stated that it was her understanding that even if the government filed such a motion, the judge was not required to accept it and had the ultimate say about her sentence. Supp. App. 374.

O'Brien addressed this issue several times on cross-examination.

O'Brien first inquired as follows:

> O'Brien: Have you been promised that you don't have to go to jail?

> Rongione: Never once was I promised.

> O'Brien: Never once?

> Rongione: I have in my head 20 years.

> O'Brien: Are you testifying today to try to get the lowest sentence you can?

> Rongione: I'm testifying because I'm a single mom with two kids and I'm doing great, something that you should be doing.

Supp. App. 545.

> The next morning, O'Brien revisited the same topic:

> O'Brien: Were you told by the agent that if you testified, you would get less time off — you would get more time off your sentence?

> Rongione: Per yesterday, when you asked me again, it wasn't nothing. They can't control anything, it's up to the judge.

Supp. App. 627-28.

Later the same day, O'Brien revisited the issue a third time. He asked Rongione if she knew that her maximum sentence was 20 years, to which she replied yes. Supp. App. 742. The court then sustained objections to questions that pertained to Rongione's sentencing guidelines and her expectations for a

5K1.1 reduction, as Rongione had already testified about these issues.

O'Brien then continued as follows:

> O'Brien: Why are you testifying today?
>
> Rongione: Testifying because I did something wrong with you, and I tell the truth. I have two small kids to worry about, and I do the right thing no matter what. I raise my kids like that. I stuck to that even prior to working with you. You tell the truth because in the end it will all come to the end and the truth will be told. The game can only go on for so long until you get caught.
>
> O'Brien: So you're not testifying today to try to get a lower sentence?
>
> Rongione: That is only up to the judge.

Supp. App. 743. O'Brien asked no further questions in this regard.

Thus, the court did not preclude O'Brien from questioning Rongione about her expectations for leniency or her sentencing exposure, but merely prevented him from asking Rongione questions that had already been asked and answered.[6]

---

[6] Notably, this questioning was but one very small portion of O'Brien's extensive cross-examination of these witnesses. O'Brien subjected Marrandino and Rongione to days of lengthy, abusive, and pointless questioning. For example, O'Brien asked Marrandino to recount for the jury how O'Brien asked him to imagine another man "pleasuring his wife." Supp. App. 266-67. Likewise, Rongione was subjected to insulting accusations of promiscuity, and suggestions that she falsely reported domestic abuse. Supp. App. 728-31. The district court not only did not improperly limit O'Brien's cross-examination of these witnesses, but gave him ample opportunity to attempt to impugn the veracity and integrity of these witnesses, including questioning about their hopes for leniency.

This situation stands in stark contrast with that in *United States v. Chandler*, 326 F. 3d 210 (2003), on which O'Brien relies. In *Chandler*, two cooperating witnesses testified that they expected to receive reduced sentences in exchange for their testimony, but the district court did not permit the defendant to inquire about how much time the witnesses would have been facing absent their cooperation. *Id.* at 222. One government witness faced a minimum 97-month sentence under the Sentencing Guidelines, but received only one month of house arrest in exchange for his guilty plea and testimony. 326 F.3d at 222. The jury heard only that the first witness faced a guideline range of 12 to 18 months, that he could have been charged with a greater offense, and that he received one month of house arrest and probation. *Id.* The jury did not learn that the other witness faced a minimum guideline sentence of 12 years, but only that she expected the government to move for a reduced sentence in exchange for her cooperation. *Id.* In finding that the district court had abused its discretion by preluding questioning about their sentencing exposure, the Court reasoned that although the jury was aware of the witnesses' incentives to lie, they were not aware of the magnitude of those incentives, which would likely have affected the jury's assessment of their testimony. The Court held that the district court had abused its discretion by preluding this questioning. *Id.*

Here, in contrast, the government elicited Rongione's statutory and guideline penalties, and the jury was thus aware of the potential "magnitude" of her cooperation. While the government did not elicit Marrandino's sentencing exposure on direct examination, O'Brien also did not ask the witness about his statutory and guideline sentence, nor did the court preclude questioning on this issue. Thus, unlike the situation in *Chandler*, the district court did not prohibit questioning about the "magnitude" of the potential sentence reductions.

Moreover, the jury here was well aware of the potential sentencing benefits of cooperation, as each of the five cooperating defendants testified about their plea agreements and sentencing expectations, and O'Brien was permitted to question each of the witnesses about this issue. For example, Michael Thompson, the first cooperating defendant to testify at trial, acknowledged on direct examination that he faced a statutory maximum of 80 years and that his guideline range was 121 to 151 months. Supp. App. 1412-13. He stated that he hoped the government would submit a motion for a reduced sentence in exchange for his cooperation but there was no promise that this would occur, and that the sentence was ultimately up to the judge. Supp. App. 1413-14, 1416. Thompson acknowledged that he was required to provide complete and truthful information and testimony, and that he could

be sentenced to the maximum penalty or prosecuted for perjury if he did not testify truthfully. He also acknowledged that the cooperation agreement was not contingent on the outcome of the trial. Supp. App. 1416.

On cross-examination, O'Brien questioned Thompson about the drug quantities he had stipulated to in the plea agreement, suggesting that the numbers, which were computed by the government, were lower than the quantities he actually dealt and the government had given him a break. Supp. App. 1424-25.[7] O'Brien repeated the statutory maximum penalty and the guideline range. Supp. App. 1426-27. O'Brien then questioned Thompson about the potential for a reduced sentence, eliciting that the government may or may not file a "5K1.1" motion for a reduced sentence. When Thompson was asked if he knew how much of reduction he could receive, the court sustained the government's objection, as Thompson had already testified that the sentence would be up to the judge.

Given the thorough discussion of the cooperation plea agreement with Thompson, it is understandable that O'Brien did not ask all of the same

---

[7] O'Brien began his questioning by showing Thompson his plea agreement and asking him if he had read the document. Supp. App. 1423. After Thompson said that he had read the agreement, O'Brien gave Thompson a copy of a Dr. Seuss book and asked him to read an excerpt, which Thompson did. O'Brien ostensibly did this to show that Thompson was illiterate and could not have read the plea agreement, but his plan backfired.

questions about the cooperation plea process of Marrandino, who testified immediately after Thompson. In any event, the court did not preclude O'Brien from questioning Marrandino about his sentencing exposure or expectations. And after Marrandino answered questions about the 5K1.1 process and stated that it was his understanding that the judge would decide if he received a reduction, the court reasonably decided to clarify that the government had the discretion to file a 5K1.1 motion but the judge had the discretion to grant or deny that request. It was also entirely reasonable that the court precluded O'Brien from asking a few repetitive questions of Rongione, the very last cooperating defendant to testify.

Thus, the record here conclusively demonstrates that the court did not improperly restrict questioning about the witnesses' expectations for reduced sentences. In any event, even if the court committed any error in this regard, any such error was entirely harmless. In determining if a limitation on cross-examination is harmless, courts consider "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684.

O'Brien fails to identify what additional questions he would have asked in this regard, or how any additional questions about whether the defendants expected to receive lower sentences would have resulted in different answers. To the extent that O'Brien was unhappy with Rongione's and Marrandino's answers or felt they were not being entirely forthcoming, he was free to attack their credibility on this point in his closing argument, but it is obvious that asking further questions on this issue would not have altered their answers in this regard. His contention that additional questioning on this issue would have led the jury to completely reject the testimony of these witnesses is itself incredible and is flatly contradicted by the record.[8] Even more outlandish is his claim that the outcome of the trial would have been different despite the testimony of the other cooperating defendants and the mountain of corroborative evidence. Indeed, even if the jury had disregarded the testimony of all cooperating co-defendants, the remaining evidence against O'Brien was overwhelming. In a trial that lasted almost six weeks, the government presented videotapes of the defendant with both an undercover

---

[8] O'Brien contends that Marrandino and Rongione were "critical" witnesses, and speculates that the that the jury "may" have rejected the testimony of the other cooperating defendants – Thompson, Frank Corazo, and Bernadino Varallo – primarily because of their past criminal conduct. He asserts that if the jury had not credited the testimony of Marrandino and Rongione, the outcome of the trial would have been different. Br. 19.

informant and an undercover FBI agent, PSR ¶ 25; videotapes and still photographs of the defendant meeting with his co-conspirators, PSR ¶ 31; patient files that proved, on their face, that the prescriptions written by the defendant to his coconspirators were illegitimate, Supp. App. 929-46; recordings of incriminating phone calls made by coconspirators while in prison implicating O'Brien, PSR ¶ 72-75; testimony of female patients who were drug addicts, from whom the defendant extorted sex acts in exchange for narcotics prescriptions, PSR ¶¶ 35, 98; the testimony a highly qualified expert witness in the field of pain management medicine that all of the defendant's prescriptions charged in the indictment were written outside the course of professional practice and for no legitimate medical purpose, PSR ¶ 104; and the testimony of an experienced medical examiner, in conjunction with that of the medical expert, that the illegitimate prescriptions written by the defendant for oxycodone and methadone resulted in the death of patient Joseph Ennis, Supp. App. 1355.

Again, this record is vastly different from that in *Chandler*, where the Court found that the error was not harmless because without the testimony of the cooperating co-defendants, whom the defendant was not permitted to cross-examine as to penalties, there was no direct evidence of Chandler's involvement in the charged drug trafficking activity. *Id.* at 224. Here, there

was overwhelming direct evidence of O'Brien's role in the drug trafficking conspiracy, including recordings and O'Brien's own patient records.

Thus, even assuming that the district court improperly limited cross-examination of Rongione and Marrandino regarding their sentencing expectations, any such error was entirely harmless.

## III. THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ON THE ELEMENTS OF DISTRIBUTION OF A CONTROLLED SUBSTANCE RESULTING IN DEATH

### Standard of Review

The Court reviews "the legal accuracy of a district court's jury instructions de novo." *United States v. Maury*, 695 F.3d 227, 261 (3d Cir. 2012). "Absent an affirmative misstatement of the applicable law, our review is for an abuse of discretion." *Id.*

### Discussion

O'Brien asserts that the district court erred when it instructed the jury on Count 124 charging the distribution of a controlled substance resulting in death. O'Brien concedes that the district court gave an instruction consistent with the Third Circuit Model Instructions, but claims the instruction, "at least applied to him," was misleading and incomplete. Br. 23. This claim is meritless.

The Controlled Substances Act imposes a 20-year mandatory minimum sentence on a defendant who unlawfully distributes a Schedule I or II drug, when "death or serious bodily injury results from the use of such substance." 21 U. S. C. § 841(b)(1)(C). In *Burrage v. United States*, 134 S. Ct. 881 (2014), the Supreme Court addressed the issue of causation in these

cases, ruling that the words "'(r)esults from' imposes . . . a requirement of actual causality. In the usual course, this requires proof that the harm would not have occurred in the absence of – that is, but for – the defendant's conduct." *Id.* at 887-88 (internal citations omitted). The Court concluded, "We hold that, at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. 841(b)(1)(c) unless such use is a but-for cause of the death or injury." *Id.* at 892. In this case, Dr. Thomas testified specifically that, but for O'Brien's improperly prescribed methadone and oxycodone, Joseph Ennis would not have died. Supp. App. 1291.

The district court instructed the jury regarding "but-for" causation, guided by the commentary to the Third Circuit Model Instructions, which suggests the following instruction:

> [The jury must find] that death or serious bodily injury resulted from the use of the controlled substance. To find that death or serious bodily injury resulted from the use of the substance, you must find that the Government proved beyond a reasonable doubt that the use of the substance was a but-for cause of the death or injury, meaning the government must prove beyond a reasonable doubt that the death or serious bodily injury would not have resulted had the victim not used the controlled substance distributed by (name).

Third Circuit Criminal Model Instructions § 6.21.841A, comment.

Here, the court instructed:

- 50 -

In order to establish that these controlled substances [oxycodone and methadone] distributed or dispensed by the defendant resulted in the death of Joseph Ennis, the government must prove that Joseph Ennis died as a consequence of his use of the oxycodone and methadone that the defendant distributed or dispensed on or about the date alleged in the indictment. The law provides that . . . whenever death is a consequence of the victim's use of a controlled substance that was distributed or dispensed by the defendant, a more serious offense is committed, regardless of whether the defendant knew or should have known that death would result. There is no requirement that the death resulting from the use of the controlled substance was a reasonably foreseeable event, or that the controlled substance was the proximal cause of the death. A finding by you that, but for the victim's ingesting of the charged controlled substance distributed or dispensed, or aided and abetted in the distribution or dispensing of, by the defendant, the victim would not have died, satisfies this standard.

The fact that Joseph Ennis may have used other drugs in addition to oxycodone and methadone is not relevant if you determine that he would not have died without ingesting these two substances, the oxycodone and methadone. That is the defendant cannot be found guilty absent evidence that the victim would have lived but for his oxycodone and methadone used which were prescribed by the defendant.

Supp. App. 1384-85.

At the charging conference, O'Brien asked the district court to expand the model instruction to instruct the jury to find that Ennis died as a consequence of oxycodone and methadone distributed or dispensed by O'Brien and taken "in accordance with instructions by the prescribing physician." Supp. App. 1431. Noting that the coroner recovered a bottle of 119 oxycodone 30 mg pills from Ennis's apartment on December 23, 2013, and that O'Brien gave Ennis a prescription for 120 oxycodone pills on December

17, 2013, O'Brien argued that Ennis had taken only one of the oxycodone pills prescribed by O'Brien, and the level of oxycodone in Ennis's blood was equivalent to five or six 30 mg pills. O'Brien speculated that Ennis had another source of oxycodone not prescribed by him. Supp. App. 1430-31.

O'Brien's speculation aside, the jury instruction, as given, addressed this issue. The jury was instructed that it must find beyond a reasonable doubt that oxycodone and methadone "distributed or dispensed by the defendant" resulted in the death of Joseph Ennis. That language mirrors the suggestions in the Third Circuit model instruction commentary. The jury was free to find the oxycodone that killed Ennis came from a source other than O'Brien. Based on the evidence, it did not. The evidence showed that O'Brien, and O'Brien alone, had been prescribing oxycodone to Ennis since October 2011. Supp. App. 1400-04. In the months leading up to Ennis's death, O'Brien dramatically increased the number of oxycodone 30 mg pills prescribed from 120 oxycodone 30 mg pills in September 2013, to 270 oxycodone 30 mg pills, and 180 oxycodone 30 mg pills in October 2013 and November 2013, respectively. Supp. App. 1403-04. Thus, the jury could have properly concluded that when Ennis obtained his last prescription from O'Brien on December 17, 2013, for 120 oxycodone 30 mg pills, he had pills left over from the exceedingly large prescriptions he obtained in October

2013 and November 2013. The jury plainly rejected O'Brien's alternative source theory, and found that O'Brien supplied the oxycodone that killed Joseph Ennis.

O'Brien also argues, as he did below, that the modified instruction was necessary because Ennis's level of methadone was higher than what would be expected if he had taken the drug as directed. Br. 22. Whether Ennis took more or less methadone or oxycodone than prescribed is irrelevant. As the jury found, the prescriptions themselves were illegal. Therefore, any instructions O'Brien provided with his illegitimate prescriptions were similarly illegitimate. O'Brien acted as a drug dealer, not as a physician. The so-called medical advice he dispensed in this context was meaningless.

O'Brien further claims that the district court clearly erred by instructing the jury that "the fact that he may have used other drugs" in addition to oxycodone and methadone "is not relevant." Br. 22. He argues that in light of the elevated levels of cyclobenzaprine found in Ennis's blood post-mortem, the presence of an additional drug was clearly relevant, and the jury should have been instructed accordingly. O'Brien misstates the instruction.

The district court instructed the jury that the use of other drugs was not relevant "if you determine that he would not have died without ingesting

these two substances, the oxycodone and methadone." In other words, if the evidence proved that the Schedule II controlled substances caused Ennis's death then other drug use would be irrelevant. Dr. Thomas and Dr. Hood testified that "but for" the oxycodone and methadone, Ennis would not have died. Supp. App. 991, 1355. Both experts testified that cyclobenzaprine alone did not cause Ennis's death. Supp. App. 1288, 1379. Thus, Ennis's ingestion of cyclobenzaprine was not a relevant factor in this case.

O'Brien notes that he objected to the statement that "there is no requirement that the death resulting from the use of the controlled substance was a reasonably foreseeable event, or that the controlled substance was the proximal cause of the death" because the court failed to define proximate cause. Nevertheless, he fails to state how the failure to define proximate cause was misleading or prejudicial, and it clearly was not. There was simply no need to define proximate cause when the jury was clearly told that it must find "but for" causation.

O'Brien further contends that the statement that "the law provides that whenever death is a consequence of the victim's use of a controlled substance that was distributed or dispensed by the defendant, a more serious offense is committed" was "unnecessary, and by implication, was prejudicial." Br. 21. This claim warrants little consideration. This is an accurate statement of the

law, and serves as a preamble to the explanation of what the jury must find in order to convict a defendant of the crime of dispensing drugs that result in death. Pointing out that illegally dispensing drugs that result in a person's death is a more serious offense than dispensing drugs that do not result in someone's death merely states the obvious and certainly did not unfairly prejudice O'Brien.

In sum, the jury was properly charged on the elements of distributing a controlled substance resulting in death, in accordance with the mandate in *Burrage*. The defendant's claim to the contrary is meritless.

# CONCLUSION

For the reasons stated above, the government respectfully requests that the judgment of the district court be affirmed.

Respectfully submitted,

LOUIS D. LAPPEN
Acting United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals
Pa. Bar No. 58126


*/s M. Beth Leahy*
M. BETH LEAHY
Assistant United States Attorney
Pa. Bar No. 202762


*/s David E. Troyer*
DAVID E. TROYER
Assistant United States Attorney
Fla. Bar No. 352586


United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8343

# CERTIFICATION

1. The undersigned certifies that this brief contains 11,439 words, exclusive of the table of contents, table of authorities, and certifications, and therefore complies with the limitation on length of a brief stated in Federal Rule of Appellate Procedure 32(a)(7)(B).

2. I hereby certify that the electronic version of this brief filed with the Court was automatically scanned by OfficeScan Real-Time Scan Monitor, version 10.5, by Trend Micro, and found to contain no known viruses. I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court.

*/s M. Beth Leahy*
M. BETH LEAHY
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this brief has been served on the Filing User

identified below through the Electronic Case Filing (ECF) system:

George Henry Newman, Esq.
George H. Newman & Associates PC
100 South Broad Street, Suite
Philadelphia, PA  19110


/s M. Beth Leahy
M. BETH LEAHY
Assistant United States Attorney


DATED:  May 31, 2017.